Opinion filed November 10, 2005












 
 
  
 
 







 
 
  
 
 




Opinion filed November 10, 2005

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-04-00072-CR 

 

                                                    __________

 

                                      ROY LEE STEINKE, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                 On Appeal from the 385th District Court

 

                                                        Midland
County, Texas

 

                                                Trial
Court Cause No. CR-28,411

 



 

                                                                   O
P I N I O N

 








Roy Lee Steinke appeals his convictions by a jury
of four counts of aggravated sexual assault. 
The jury assessed his punishment in each count at 99 years in the Texas
Department of Corrections, Institutional Division.  He contends in two points that the evidence
is factually insufficient to support his convictions and that his convictions
of both Counts I and II and both Counts IV and V violate the Double Jeopardy
Clause of both the United States and Texas Constitutions.   We affirm as to Counts I and IV, and we
reverse and order dismissed Counts II and V.

Steinke urges in point one that the evidence is
factually insufficient to support his convictions.  In a factual sufficiency review, we view all
of the evidence in a neutral light and will set the verdict aside only if the
evidence is so weak that the verdict is clearly wrong and manifestly unjust or
if the contrary evidence is so strong that the standard of proof beyond a
reasonable doubt could not have been met.  Zuniga v. State, 144 S.W.3d 477
(Tex.Cr.App.2004).

Meagan Stroup, sister of the complainant=s stepfather, testified that, as she
was bathing the complainant and the complainant=s
sister on or about February 19, 2003, they were sliding down the back of the
bathtub just as they always did.  She
related that at that time she noticed that the complainant=s bottom was really red and
bruised.  She stated that she got her
friend Lacy to watch the girls while she went and got her mother.  She said that she told her mother that the
complainant said, ARoy
sticks him (sic) heinie in me.@  She testified that after this they took the
complainant to the hospital.  Meagan
related that at that time the complainant was 3 years of age.  She acknowledged that she had bathed the
child often but had never noticed this condition before.  She said that, if the complainant had been
red and bruised before, she would have noticed. 
Meagan gave her age as 13.

Chris Stroup, Meagan=s
mother, testified that, when Meagan brought the complainant to her, she asked
the complainant what happened and that the complainant replied, ARoy poked him=s
(sic) heinie at me.@  She indicated that the complainant=s anus was Abruised,
black.@  She said that it was Ajust
a bruised purple looking, that went all the way to her cheeks of her buttocks.@ 
She said that she called her husband, who is a deputy with the sheriff=s office.  She related that he told her to take the
complainant to the hospital.  She
testified that she had previously bathed the child but had never seen anything
like it before.  She acknowledged that
she had never previously heard the complainant complain about someone named
Roy.  She insisted that there were no
other ARoys@ besides Steinke who would have had
contact with the complainant.  She said
that she was quite sure that if the complainant had had the injuries earlier
she would have noticed.  Chris testified
that her son, Curtis Robertson, was 24 years of age at the time in question and
that he had bathed the girls.








In a videotaped interview, the complainant told Jo
Ann Sarabia that ARory@ stuck his Aweenie@ in her Aheinie.@ 
At times, the complainant=s
descriptions of things were incomprehensible or fanciful.  For example, when asked if she had ever seen ARory=s
weenie,@ she told
Sarabia, AIt was
brown, with a bear, with a butterfly, with a heart, with a bear, with a
dinosaur, with a star, with a heart, with a (INAUDIBLE).@  The complainant also told Sarabia that the Aweenie@
hurt and that no one else had done anything like that.

Lucy Smith, a therapist at the Midland Rape Crisis
and Children=s
Advocacy Center, explained that the complainant used avoidant behaviors when
asked about the details of what had happened and that this is what children
do.  When asked about the complainant=s comments regarding ARory=s@ skin color, that it was Ablue and purple and orange,@ Smith said that it was not uncommon
for someone at the complainant=s
developmental level to say that.  She
said that it would be common for a child the complainant=s
age to explain something that had happened to her a year before.  She said that, in determining if an outcry is
valid, she looks at a child=s
developmental level, the child=s
verbal skills, and whether the story is consistent over time.  She said that in the complainant=s case the details were consistent over
time.

On cross-examination, Smith acknowledged that it
was possible for a child the complainant=s
age to be coached.  She admitted that she
did not know exactly what went on between the complainant and her support group
prior to the taping.  She testified that
one can tell a child who has been coached by their demeanor, by the way they
project themselves, and by the way they state things.  She said that they would tell things exactly
by rote and have more details.  She
insisted that the complainant=s
mother never told her that she suspected Chris Robertson was responsible for
the sexual abuse.  Smith also related
that she thought that the complainant=s
ducking and turning away during the taped interview was a sign of embarrassment
on the complainant=s part. 








Sarabia, the interviewer on the tape, testified
concerning her forensic interview training. 
She spoke of criteria that she uses in assisting investigators in
determining whether a complainant is being truthful.  She related that one criterion is the timing
and circumstance of disclosure.  She
noted that the child=s
outcry came during bathing and that it was spontaneous.  Another criterion appears to be, according to
Sarabia, whether the language used in the outcry was congruent with the child=s developmental level.  She stated that in this case the complainant=s language is congruent with her
developmental level.  She said that a
third criterion is quality and quantity of details.  She insisted that it would be sufficient for
a child of that age to give the Awho
and what.@  She related that a fourth criterion is the
appropriateness of the child=s
sexual knowledge, based upon the child=s
developmental level.  She stated that a
child of the complainant=s
age would not ordinarily know that a Aweenie@ goes into a Aheinie.@ 
Sarabia set forth a fifth criterion, repetition over time.  She noted the consistency of the reports as
to what the complainant said about what had happened to her.  Sarabia related another criterion,
plausibility of abuse.  She expressed her
opinion that abuse from Steinke is plausible with the complainant.  Finally, she noted the last criterion, the
emotional reaction of the child.  She
said that she observed avoidant behavior both at the 2004 interview and at an
earlier interview in February 2003. 

The February 2003 interview was played before the
jury.  The complainant did not make any
type of outcry in that videotape. 
Sarabia explained that the interview was conducted at 9:00 p.m. after
other investigation and that the complainant would have been tired.  She insisted also that the child was being
avoidant.  She insisted that the
complainant had affirmed, but never denied, abuse by Steinke.  She acknowledged that she was unaware there
might be three Roys in the family who had access to the child.  She acknowledged that she was unaware of any
allegation that it might have been Curtis Robertson who was guilty of the abuse
but that it would have been important to know. 

Shanel Rothenberger, the complainant=s mother, identified Steinke as someone
with whom she used to go out and as the father of the complainant=s sister.  She also stated that Curtis Robertson was the
father of the complainant=s
other sister and that his mother is Chris Stroup, the mother of Meagan
Stroup.  She related that, when Chris
told her of the molestation, she was with Steinke.  She said that, when Steinke figured out about
the molestation charge, he took out his wallet, counted his money, and told her
he did not do it.  She stated that he was
not concerned about who did it or about the complainant=s
well-being.  She said that Steinke took
her to the hospital and then left rather than staying and being
supportive.  He said that he did not want
to be around people who could accuse him of such a thing.  She indicated that she did not want to
believe the accusation because she loved Steinke but that he was the only one
the child accused of doing it.








Rothenberger testified that the complainant had
not changed her story in a year and that she did not like to talk about
Roy.  Rothenberger acknowledged that
there were two other Roys in the family besides Steinke: a grandfather and an
uncle.  She described the grandfather as
someone who is very sick and who has had five bypasses.  She said that he could hardly get out of bed,
that the complainant rarely sees him, and that the complainant had not been
alone with him.  She insisted that the
complainant had never seen her uncle Roy until after any abuse occurred.  She also had a picture of a friend named
Corey and said that the complainant denied that he was involved and that Corey
did not have access to the complainant. 
She related that there were times when the complainant would have been
alone with Steinke.  Rothenberger
acknowledged that she had been using speed and cocaine.  She said that she was unable to protect her
children during the time she was using drugs. 
She denied bringing any Roys other than Steinke around her
children.  Rothenberger testified that
Pam Roges is her mother.

Rothenberger indicated that Steinke stayed with
her for two weeks in January or February of 2002, a year earlier from the date
the complainant was taken to the hospital for investigation of abuse.  She said that during that time she was on
drugs and unable to protect the complainant. 
She said that she often slept during the day and did not wake until noon
or one o=clock in
the afternoon.  She indicated that she
did not know if Steinke ever missed work during the two-week period.  She acknowledged that generally someone was
always around when she was with Steinke and had the complainant.  Rothenberger said that two incidents she
described where Steinke had been with the complainant for 15 minutes at a time
occurred about 2 weeks before February 19, 2003.  She said she never observed Steinke sexually
abuse the complainant.  She did say that
she heard the complainant ask Steinke if he wanted to see her Aninnies,@
which in her family=s
language meant Abreasts.@








Rothenberger acknowledged that she had told
Winston Steinke, Roy Steinke=s
brother, that she did not believe that his brother had committed the acts of
which he was accused but that she believed Curtis Robertson, Earl Stroup, or
Tony Roges could have done it.  She said
that, during the one-year period from February 19, 2002, to February 18, 2003,
she did not observe any part of the complainant=s
rear or front privates that appeared to be bright red, bruised, or anything
like that.  Rothenberger acknowledged
that the complainant had never complained to her about Steinke touching her
privates or anything like that. 
Rothenberger acknowledged that Chris and Earl Stroup kept the child
every weekend, and sometimes during the week, during the yearlong period prior
to discovery of the abuse.

Pam Roges testified that she is the mother of
Shanel Rothenberger and, therefore, the complainant=s
grandmother.  She indicated that on
February 19, 2003, after receiving a call from Chris Stroup, she went to Chris=s home and examined the complainant=s bottom.  She noticed that it was bruised and Areal red.@  She stated that, when she asked the
complainant what happened, she said that ARoy
had poked her...with his weenie.@  She indicated that the complainant said that
she did not like Roy and did not want to be around him.  According to Pam, the complainant did not say
anything about how many times this had happened.  Pam also acknowledged that she had never
observed any inappropriate behavior on the part of Steinke toward the
complainant.  Pam indicated that she had
kept the complainant at night and bathed her during the year before the outcry
but had never seen any bruising or redness of her privates.  She said that her brother Roy did not have
contact with the complainant when he came from Alabama to be with his father,
who was thought to be dying.  She said
that Roy=s trip
was after February 19, 2003.  Pam
observed that the complainant says Steinke=s
name as ARory.@ 
She also indicated that the complainant referred to her uncle as AUncle Roy@
and to her grandfather as AGrandpa
Bill.@

Lynne Glasscock testified that she is a registered
nurse who had been a Sexual Assault Nurse Examiner for seven years.  She described the Sexual Assault Nurse
Examiner program as an attorney general=s
program that required 56 hours of classroom work and certain examinations.  She indicated that she examined the
complainant on February 19, 2003.  She
said that, when the complainant was put in a position on her back with her
knees up and spread apart, she took her fingers and spread her labia majora
apart when the examiner said that she wanted to look at her private parts.  She noted that that was very unusual behavior
for a three-year-old child.








Glasscock testified that, when she examined the
complainant=s hymen,
she found notches on the hymen, which indicated to her that there had been
injury and that the area had healed.  She
stated that the notch would have been caused by something tearing the piece of
tissue all the way through or by something that had chronically rubbed and
eroded it.  She suggested that the hymen
would be thin and painful in this condition. 
She said that a mother or a grandmother would not know how to recognize
the problem.  Glasscock identified State=s Exhibit No. 4 as a picture of the
redness and bruising that the relatives would have seen.  She said that, when pressure was applied to
the complainant to cause her anus to open up for observation, there was an anal
dilation within five seconds.  She stated
that this indicated that there was stretching and/or tearing of the anal
sphincter muscle fibers.  She related
that upon examination she found what she termed Aerosion,@ noticing that there was constant
rubbing that had caused a skinned area on the anus.  She said that the anal opening was elongated,
rather than in a circle, and that this was indicative of torn fibers.  She indicated that she observed notching in
the anal area as well.  She testified
that in her opinion, if the complainant said that Roy stuck his Aweenie@
in her Aheinie,@ his doing so would cause the kind of
injuries she had observed.  She stated
that the injury could either be fresh or from two to three weeks before.  She also indicated that there had been more
than one incident.  She declared that
there could have been three incidents eight weeks earlier or one incident every
six weeks for years.  She concluded that
there was no way to date the abuse and that it could be eight weeks, a year, or
two years.  Glasscock concluded that
there was penetration because there was injury to the hymen.      David Wesley Thornhill, Steinke=s brother-in-law, testified that he had
never seen anything leading him to believe that the complainant was afraid of
Steinke.  To the contrary, he indicated that
the complainant was fond of Steinke.  He
said that he never saw Steinke engage in any inappropriate behavior toward the
complainant.  He stated that Steinke had
never told him that he had done anything inappropriate with the
complainant.  He also acknowledged that
he had never seen anything inappropriate between either Tony Roges or Curtis
Robertson and the complainant.  He did
testify that he saw Rothenberger and Pam and Tony Roges use controlled
substances in the child=s
presence and saw the complainant running around without clothes.  He said that he also saw Curtis Robertson use
controlled substances in the presence of the complainant.  








Steinke denied that he had ever been alone with
the complainant for more than 5 to 15 minutes and stated that that occurred on
only one occasion.  He denied ever
bathing the complainant but stated that he did observe Rothenberger bathing
her.  He said that he heard the
complainant tell Pam Roges that her Aheinie@ hurt. 
He said that, when he took Rothenberger to the hospital, he did not stay
because Curtis Robertson, who had threatened his life, was there.  He said that he had no explanation as to why
the child used his name or one that sounded like it when making her
accusations.  He denied doing the things
he was accused of to the complainant.

James Self testified that he observed Tony and Pam
Roges and Rothenberger smoke marihuana around the complainant.  He said that Steinke was not present on those
occasions.  We hold that the evidence is
factually sufficient to support Steinke=s
conviction because the evidence is not so weak that the verdict is clearly
wrong and manifestly unjust and any contrary evidence is not so strong that the
standard of proof of beyond a reasonable doubt could not have been met.  We overrule point one.  

Steinke insists in point two that his conviction
and sentence of Counts I, II, IV, and V violated the double jeopardy clause of
the Fifth Amendment to the United States Constitution and Article I, section 14
of the Texas Constitution.  The jury
convicted Steinke, in Counts I and II, of aggravated sexual assault on or about
February 6, 2003, by causing the penetration of the complainant=s sexual organ by his sexual organ and
by contacting her sexual organ with his. The jury convicted Steinke, in Counts
IV and V, of aggravated sexual assault on or about February 6, 2003, by
penetrating the complainant=s
anus with his sexual organ and by contacting her anus with his sexual organ.

As can be seen, the indictment alleged aggravated
sexual assault by contact and penetration with respect to the complainant=s sexual organ and anus on one
date.   While there was some evidence
that abuse of the child was ongoing, the child only spoke in the interview of a
single incident.  Under all of the facts
as we have outlined above, including the videotape of the complainant, we hold
that there would not be legally sufficient evidence to establish that Steinke
sexually assaulted the complainant on some additional occasion.  Therefore, we agree with Steinke that the
State is precluded because of the double jeopardy clause of the United States
Constitution from convicting him of both Counts I and II and both Counts IV and
V.  See Ochoa v. State, 982 S.W.2d
904, 908 (Tex.Cr.App.1998).








The State argues that Steinke may not present his
double jeopardy claim for the first time on appeal.  However, a double jeopardy claim may be
raised for the first time on appeal or even for the first time on collateral
attack when the undisputed facts show the double jeopardy violation is clearly
apparent on the face of the record and when enforcement of usual rules of
procedural default serves no legitimate state interest.  Gonzalez v. State, 8 S.W.3d 640, 643
(Tex.Cr.App.2000).  In this case, the
undisputed facts show that the double jeopardy violation is clearly apparent on
the face of the record and when enforcement of usual rules of procedural
default serves no legitimate state interest. 
Consequently, Steinke may present this point in this appeal.  The State responds by pointing out the
possibility that there may have been more than one incident; but, as we have
noted, the evidence is legally insufficient to support a conviction based on an
additional incident.  Based upon Patterson
v. State, 152 S.W.3d 88 (Tex.Cr.App.2004), the State notes that, in such an
event, Steinke=s claim
might have merit.  Holding that Steinke=s claim does have merit, we sustain
point two.

The judgments are affirmed with respect to Counts
I and IV and reversed and ordered dismissed as to Counts II and V.  

 

PER CURIAM

 

November 10, 2005

Do not publish.  See TEX.R.APP.P.
47.2(b).

Panel
consists of: Wright, C.J., and

McCall,
J., and Hill, J.[1]











[1]John G. Hill, Former Chief Justice, Court of Appeals,
2nd District of Texas at Fort Worth sitting by assignment.